COLORADO COURT OF APPEALS 2017COA128

Court of Appeals No. 14CA1795
El Paso County District Court No. 13CR4158
Honorable Barney Iuppa, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Marcus Lee Robinson,

Defendant-Appellant.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division VI
Opinion by JUDGE BERGER
Harris, J., concurs
Furman, J., specially concurs

Announced October 19, 2017

Cynthia H. Coffman, Attorney General, John T. Lee, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Douglas K. Wilson, Colorado State Public Defender, Lynn Noesner, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1     During opening statement in this criminal prosecution charging defendant, Marcus Lee Robinson, with multiple counts of sexual assault, attempted sexual assault, and unlawful sexual contact, the prosecutor told the jury:

> You're going to hear that [one of the victims, A.M.,] is white. And she's actually pretty pasty. She's pasty white. And you obviously have seen Mr. Robinson is dark. He is an African American of dark complexion. [The other victim, E.G.,] looks over and she can see a dark penis going into a white body. That's how graphic she could see [sic].

¶ 2     Defense counsel did not object, and the trial court did not interrupt the proceedings to either admonish the prosecutor or instruct the jury to disregard the prosecutor's statements.

¶ 3     Viewed objectively, the prosecutor's statements could have been reasonably understood by the jury as an appeal to racial prejudice that raises a substantial question whether Robinson received a trial free from the taint of racial prejudice.[1]  Only by

---

[1] In deciding this case we assume both that the prosecutor acted in good faith and that the prosecutor does not harbor any racial animus. We recognize that it is possible that the last, unintelligible, sentence of the quoted portion of the prosecutor's opening statement was an ineffective attempt to explain why she was making what otherwise were inappropriate racially based statements. The prosecutor's subjective intent is irrelevant. We

reversing Robinson's convictions can we ensure that racial prejudice plays no part in the adjudication of this case. Accordingly, we reverse Robinson's convictions and remand for a new trial. Because they are likely to arise on retrial, we also address Robinson's other contentions of prosecutorial misconduct.[2]

## I. Relevant Facts and Procedural History

¶ 4 A.M. and her roommate hosted a party at their apartment. A.M. drank a lot of alcohol and eventually passed out on a couch. E.G. also attended the party and she became ill after the alcohol she drank reacted with her prescription medication. E.G. fell sleep on the same couch on which A.M. had passed out.

¶ 5 Robinson, who was in an intimate relationship with A.M.'s roommate, arrived at the apartment late in the night, when the

_____

view the prosecutor's words objectively, and analyze whether such words, regardless of the intent, are inconsistent with Robinson's right to a fair trial, free from racially charged words and concepts. *Wend v. People*, 235 P.3d 1089, 1099 (Colo. 2010) (holding that improper statements made by a prosecutor, regardless of intent, can affect the jury's impartiality, thus corrupting the fundamental fairness of the trial).

[2] In view of our disposition, we do not address Robinson's assertion that the Colorado Sex Offender Lifetime Supervision Act of 1998 (SOLSA), §§ 18-1.3-1001 to -1012, C.R.S. 2017, under which he was sentenced, is unconstitutional, or that the mittimus incorrectly reflects the crimes of which he was convicted.

party was winding down. E.G. testified that Robinson woke her by straddling her head and putting his exposed penis in her face. She told him to go away and he did, at least for a time. E.G. wakened again to see Robinson rubbing A.M.'s thighs and breasts (A.M. remained asleep or unconscious) and again told him to go away. She was awakened a third time when, she testified, she saw Robinson vaginally penetrating the still sleeping or unconscious A.M. E.G. told the jury that she yelled at Robinson and he left the apartment. E.G. called 911 to report the sexual assault and medical personnel were dispatched to attend to A.M., who ultimately was revived.

¶ 6 After Robinson left, he sent A.M.'s roommate a text message, admitted at trial, that said, "That girl was curse n out me I must did something if dig dumthg ribg I'm sorry so lft don't knie I'm s [sic]." Robinson explained to the police that "he knew he was in the wrong for trying to have sex with [A.M.]" because he was in a relationship with her roommate.

¶ 7 While Robinson admitted to the police that he asked A.M. to have sex with him, he denied any sexual contact with her, claiming

that he left her alone after she repeatedly declined his requests. Robinson also denied any sexual contact with E.G.

¶ 8     As to A.M., Robinson was charged with two counts of sexual assault (victim helpless); two counts of sexual assault (victim incapable); and two counts of unlawful sexual contact (victim helpless). As to E.G., Robinson was charged with one count of attempted sexual assault (victim incapable); one count of attempted sexual assault (victim helpless); and one count of attempted unlawful sexual contact (victim helpless).

¶ 9     At trial, the nurse who examined A.M. testified that she had no injuries to her internal or external genitalia. A DNA expert also testified that the trace amount of male DNA found on A.M.'s external genitalia was too small of a sample to be matched to any individual, including Robinson.

¶ 10     The jury acquitted Robinson of all of the charges related to E.G. It acquitted Robinson of the completed crimes of sexual assault against A.M., thus rejecting, at least in part, E.G.'s testimony, but convicted him of two counts of unlawful sexual contact and two counts of the lesser included offense of attempted

sexual assault. The trial court sentenced Robinson under the Sex Offender Lifetime Supervision Act to four years to life imprisonment.

## II. Analysis of the Prosecutor's Raced-Based Statements During Opening Statement

¶ 11    Robinson argues that the prosecutor's description of "a dark penis going into a white body" during opening statement constituted prosecutorial misconduct amounting to plain error, requiring reversal of his convictions. We agree.

¶ 12    We engage in a two-step analysis to review claims of prosecutorial misconduct. *Wend v. People,* 235 P.3d 1089, 1096 (Colo. 2010). First, we determine whether the prosecutor's conduct was improper "based on the totality of the circumstances." *Id.* If we conclude that the conduct was improper, we then determine whether it warrants reversal according to the proper standard of review. *Id.*

### A. The Prosecutor's Opening Statement Was Flagrantly, Glaringly, and Tremendously Improper

¶ 13    "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate." Colo. RPC 3.8 cmt. 1. More than eighty years ago, the United States Supreme Court explained that a prosecutor's interest in a criminal prosecution "is not that

5

[she] shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935).

¶ 14    In executing her substantial powers, a prosecutor must refrain from improper methods calculated to produce a wrongful conviction. *Harris v. People*, 888 P.2d 259, 263 (Colo. 1995). This constraint protects a defendant's right to be tried by a fair and impartial jury "empaneled to determine the issues solely on the basis of the evidence introduced at trial rather than on the basis of bias or prejudice for or against a party." *Id.* at 264; *see* U.S. Const. amend. VI; Colo. Const. art. II, § 16.

¶ 15    Prosecutorial remarks that evoke *any* kind of bias or prejudice are always improper; "such argument clearly trespasses the bounds of reasonable inference or fair comment on the evidence." *Harris*, 888 P.2d at 265 (quoting ABA Standards for Criminal Justice: Prosecution Function and Defense Function § 3-5.8 cmt. (3d ed. 1993)); *see also People v. Dunlap*, 975 P.2d 723, 758 (Colo. 1999).

¶ 16    A prosecutor's appeal to racial stereotypes or racial bias to achieve a conviction is especially deplorable and gravely violates a defendant's right to due process of law. *Harris*, 888 P.2d at 264; *see* U.S. Const. amends. V, VI, XIV, § 1; Colo. Const. art. II, §§ 16,

25; *see also Batson v. Kentucky*, 476 U.S. 79 (1986); *Miller v. North Carolina*, 583 F.2d 701, 703 (4th Cir. 1978); *State v. Monday*, 257 P.3d 551, 556 (Wash. 2011).

¶ 17    The prosecutor did not articulate to the jury any conceivably proper use of the race-based statements.  Thus, irrespective of whether a different record might justify such statements, this record does not permit such a conclusion.  Instead, viewed objectively, the prosecutor's opening statement, by its words and in the context it was presented to the jury, was an appeal to racial prejudice.  Indeed, the prosecutor's words invoked some of the most damaging historical racial stereotypes — stereotypes that have infected judicial proceedings in this country for generations.  *See, e.g.*, *Loving v. Virginia*, 388 U.S. 1, 3, 7 (1967) (rejecting the trial judge's assertion that "Almighty God created the races white, black, yellow, malay and red, and he placed them on separate continents . . . [t]he fact that he separated the races shows that he did not intend for the races to mix").

¶ 18    To be sure, in limited instances the race of the defendant, the victim, or a witness may be relevant to the issues presented.  "An unembellished reference to evidence of race simply as a factor

7

bolstering an eyewitness identification of a culprit, for example, poses no threat to purity of the trial." *United States v. Doe*, 903 F.2d 16, 25 (D.C. Cir. 1990). "The line of demarcation is crossed, however, when the argument shifts its emphasis from evidence to emotion." *Id.* This principle is especially pronounced when, as here, a prosecutor's argument objectively appeals to racial prejudice in the context of a sexual crime, "for few forms of prejudice are so virulent." *Miller*, 583 F.2d at 707.

¶ 19 The Attorney General points out that on direct examination, E.G. testified that she was able to see A.M. in the dimly lit room because of A.M.'s light complexion. But E.G. never testified that Robinson's darker complexion aided her ability to see what was happening. To the contrary, the only time that E.G. testified about Robinson's skin tone was in direct response to the prosecutor's questions about Robinson's race and complexion:

> PROSECUTOR: How could you see that [A.M. was naked from the waist down]?
>
> E.G.: *Because it was a dark room and [A.M.] -- I hate to say it, but she's really, really white. So I could see that she was naked from the waist down.*
>
> Q: What was going on at that point?

A: He was inside of her. He was having sex with her.

Q: How do you know he was inside of her?

A: Because I could see it. I could see it from my angle. He was in the process of having sex with her. And then he realized that I woke up. And he looks over to me as he's penetrating her[.]

. . . .

Q: You said he was penetrating her. How was Mr. Robinson dressed at this point?

A: Um, at this point by the third incident he was actually -- he was naked from the waist down. That I do remember. I can't remember if he was wearing a shirt or not. But he was naked from the waist down because he had to run and get pants.

Q: *What race is Mr. Robinson?*

A: *He's African American.*

Q: *And how would you describe his complexion?*

A: *It's dark.*

Q: Could you see his penis?

A: Like if I had to draw a picture of it, no. But the fact that I saw him from the waist down and he was naked from the waist down and when he took off, I could see his butt clearly.

Q: *And is he dark complected at that location on his body as well?*

9

A: *Yes.*

(Emphasis added.)

¶ 20    The prosecutor drew no connection between this examination (or her opening statement) and any proper purpose for the use of the raced-based statements.  Instead, the quoted colloquy regarding the defendant's race and skin tone was entirely gratuitous given that the defendant was in the courtroom during the trial.  Never did the prosecutor explain why Robinson and A.M.'s different skin tones aided E.G.'s visual perception or were otherwise a proper consideration.

¶ 21    *State v. Blanks*, 479 N.W.2d 601 (Iowa Ct. App. 1991), is instructive.  There, the defendant (who, like Robinson, was African-American) was charged with multiple crimes stemming from a violent argument he had with his white girlfriend.  During arguments to the jury, the prosecutor referred to *Gorillas in the Mist* (Universal Pictures 1988), a movie about the behavior of gorillas.  *Id.* at 602.  The prosecutor later asserted that he was merely trying to suggest that humans, unlike gorillas, must be subject to a rule of law.  *Id.*

¶ 22     The Iowa Court of Appeals concluded that the prosecutor's reference to the movie, in which a "young white woman stands alone against . . . black African hunters . . . [who] violently murder her," improperly injected racial overtones into the trial. *Id.* at 604-05. The court held that despite the prosecutor's "good faith intentions and what he claims to be an innocent remark, there is the prejudicial possibility that from the jury's standpoint an attempt was made to compare the behavior of the defendant with that of apes and gorillas." *Id.* at 605. It concluded that it was the effect, not the intent, of the prosecutor's comments that unfairly prejudiced the defendant. *Id.*

¶ 23     In our view, Robinson's prosecutor's statements were comparable to the prosecutor's conduct in *Blanks*. In the context of a sexual assault case, the prosecutor's graphic description of "a dark penis going into a white body" posed an unacceptable risk of poisoning the jury based on racial prejudice.

¶ 24     This nation is burdened with a tragic history of punishing black men for sexual crimes against white women much more severely than white men who committed the same crimes. *See* Jeffrey J. Pokorak, *Rape as a Badge of Slavery: The Legal History of,*

11

*and Remedies for, Prosecutorial Race-of-Victim Charging Disparities*, 7 Nev. L.J. 1, 25 (2006). The prosecutor's statements echoed a time when judges instructed juries that "they should presume no White woman in Alabama would consent to sex with a Black." *Id.* at 25 n.128; *see also Pumphrey v. State*, 47 So. 156, 158 (Ala. 1908) (holding that in determining whether an assault was made with intent to rape, the jury may consider that the woman assaulted was white and that the accused was black, a now defunct rule applied as recently as 1953 in *McQuirter v. State*, 63 So. 2d 388, 390 (Ala. Ct. App. 1953)).

¶ 25    Against this sobering historical backdrop, we conclude that the prosecutor's conduct was not only improper, but "flagrantly, glaringly, [and] tremendously improper." *Domingo-Gomez v. People*, 125 P.3d 1043, 1053 (Colo. 2005) (quoting *People v. Avila*, 944 P.2d 673, 676 (Colo. App. 1997)).

## B.    Reversal is Required

¶ 26    The more difficult question in this case is whether the prosecutor's statements and questions require reversal. Because Robinson did not object, we review only for plain error. Reversal is required if the misconduct was obvious and "so undermined the

fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction." *Wilson v. People*, 743 P.2d 415, 420 (Colo. 1987).

¶ 27    We first conclude that the impropriety of the statements, given their lack of context that arguably might, under very unusual circumstances, have justified such race-based statements, was obvious. *Hagos v. People*, 2012 CO 63, ¶ 18. Except under extremely rare circumstances, such racially based statements are, and have been for years, totally off-limits in all courts in the United States. *See generally* Debra T. Landis, Annotation, *Prosecutor's Appeal in Criminal Case to Racial, National, or Religious Prejudice as Ground for Mistrial, New Trial, Reversal, or Vacation of Sentence — Modern Cases*, 70 A.L.R. 4th 664 (1989) (collecting and analyzing cases determining whether racial statements made by a prosecutor require reversal). The only remaining question is whether the statements cast serious doubt on the reliability of Robinson's convictions.

¶ 28    We agree with the Attorney General that several circumstances may have mitigated the impact of the prosecutor's statements. First, "[a] passing reference in opening statements . . . may not be

13

prejudicial in the context of a lengthy trial," *People v. Rios*, 2014 COA 90, ¶ 35, and here the prosecutor's statements were brief and not repeated (although, as noted above, the prosecutor's direct examination of E.G. also addressed race). But Robinson's trial was not lengthy: excluding voir dire of the prospective jurors and deliberations, it lasted less than two days.

¶ 29 Second, courts recognize that a failure to object may demonstrate defense counsel's belief that the statement was not overly damaging. *People v. Rodriguez*, 794 P.2d 965, 972 (Colo. 1990).

¶ 30 Third, we acknowledge that the trial court instructed the jury "not to allow bias or prejudice, including gender bias, or any kind of prejudice based upon gender" to influence its decisions, and "[w]e presume that the jury followed the court's instructions, absent evidence to the contrary." *People v. Garcia*, 2012 COA 79, ¶ 20. But other than the standard instruction on bias or prejudice (which focused on gender discrimination rather than racial discrimination), the trial court never admonished the prosecutor or instructed the jury to disregard the offending statements.

14

¶ 31    Fourth, the fact that the jury acquitted Robinson of all of the charges related to E.G. and the most serious charges related to A.M. suggests that it could fairly and properly weigh and evaluate the evidence without considering extraneous factors. *People v. Braley*, 879 P.2d 410, 414-15 (Colo. App. 1993). But this does not foreclose the possibility that racial animus nevertheless played a role in the jury's decision finding Robinson guilty of other serious sex crimes, particularly when the evidence of guilt in this case was not overwhelming. *See People v. Estes*, 2012 COA 41, ¶¶ 39, 42 (holding that prosecutorial misconduct in closing argument did not warrant reversal because, among other things, overwhelming evidence supported the guilty verdict).

¶ 32    We observe that when the jury acquitted Robinson of all of the alleged completed sex offenses against A.M., the jury necessarily rejected the most damaging portions of E.G.'s testimony — that she observed Robinson penetrating A.M. We do not know why the jury then convicted Robinson of attempted, not completed, sex offenses against A.M. This disconnect does not provide comfort that the jury's verdict was completely free of racial bias.

¶ 33    Notwithstanding the mitigating factors presented by the Attorney General, we conclude that the prosecutor's conduct requires reversal for four reasons.

¶ 34    First, earlier this year, the United States Supreme Court again instructed the lower courts that we must treat errors implicating racial discrimination "with added precaution." *Pena-Rodriguez v. Colorado*, 580 U.S. ___, ___, 137 S. Ct. 855, 869 (2017). "[R]acial bias implicates *unique* historical, constitutional, and institutional concerns." *Id.* at ___, 137 S. Ct. at 868 (emphasis added).

¶ 35    Second, we are mindful that racial bias operates on multiple levels. The juror's statements in *Pena-Rodriquez* typify overt racial prejudice. But racial prejudice can be much more subtle and equally prejudicial. *See, e.g., State v. Kirk*, 339 P.3d 1213, 1216 (Idaho Ct. App. 2014) ("An invocation of race by a prosecutor, even if subtle and oblique, may be violative of due process or equal protection."); *State v. Cabrera*, 700 N.W.2d 469, 475 (Minn. 2005) ("Bias often surfaces indirectly or inadvertently and can be difficult to detect. . . . Affirming this conviction would undermine our strong commitment to rooting out bias, no matter how subtle, indirect, or veiled.").

¶ 36     Third, we also recognize, as have numerous scientists and academics, that principles of primacy may cause statements and arguments made early in a trial to have a disproportionately influential weight. *See, e.g.*, L. Timothy Perrin, *From O.J. to McVeigh: The Use of Argument in the Opening Statement*, 48 Emory L.J. 107, 124 (1999); *see also* John B. Mitchell, *Why Should the Prosecutor Get the Last Word?*, 27 Am. J. Crim. L. 139, 157-58 (2000) (discussing primacy studies in the trial context, including one that concluded that some eighty percent of jurors make up their minds on civil liability after opening statement).

¶ 37     Finally, in view of the unique concerns attendant to a prosecutor's appeal to racial prejudice, we agree with the Washington Supreme Court's conclusion that a comment such as the one at issue here "fundamentally undermines the principle of equal justice and is so repugnant to the concept of an impartial trial its very existence demands that appellate courts set appropriate standards to deter such conduct." *Monday*, 257 P.3d at 557-58.[3]

---

[3] While it may be tempting to characterize this type of prosecutorial misconduct as structural error, we resist the temptation, partly because no court has found that even blatantly racially biased statements constitute structural error, but also because we simply

17

¶ 38　　Although under the circumstances presented we cannot know with certainty what impact, if any, the prosecutor's conduct actually had on the jury, *see Pena-Rodriguez*, 580 U.S. at ___, 137 S. Ct. at 866; *People v. Juarez*, 271 P.3d 537, 544 (Colo. App. 2011); *see also* CRE 606(b), the risk that Robinson did not receive a fair trial by unbiased jurors simply is too great to ignore.  It is the responsibility of courts "to purge racial prejudice from the administration of justice."  *Pena-Rodriguez*, 580 U.S. at ___, 137 S. Ct. at 867.  Only by reversing Robinson's convictions and giving him a new trial without racial taint can we discharge this responsibility.

### III.　Evidence Regarding Robinson's Infidelity

¶ 39　　To provide guidance on retrial, *Kaufman v. People*, 202 P.3d 542, 546 (Colo. 2009), we briefly address Robinson's argument that the prosecutor engaged in misconduct when she implied that Robinson was unfaithful to his girlfriend.

---

cannot discern where the line would be drawn between such structural error and other improper and prejudicial prosecutorial statements.

¶ 40    As noted above, at the time of the alleged sexual assaults, Robinson was in an intimate relationship with A.M.'s roommate. Robinson was also living with still another woman at that time.

¶ 41    During direct examination of one of the investigating officers, the prosecutor proved that Robinson sent a text message apology to A.M.'s roommate after the alleged sexual assaults. The prosecutor then attempted to ask the officer about Robinson's relationship with the woman with whom he lived. She asked, "Did you later learn from [the woman] that she thought it was —." Before any answer was given, Robinson objected, and the trial court sustained his objection.

¶ 42    During closing, Robinson argued that his text message apology was merely an admission that had acted improperly (but not criminally) when he attempted to have consensual sex with A.M. at a time when he was supposed to be with A.M.'s roommate.

¶ 43    In rebuttal closing, the prosecutor argued: "Vague, speculative, imaginary. Mr. Robinson's apologizing for trying to cheat on [the roommate]. That is why is he apologizing? You heard he lives with another woman." Robinson objected, and the trial court overruled his objection. The prosecutor went on to say,

19

> He shares an apartment with [the woman]. He drives [her] car. And he's coming over to [A.M.'s roommate's] house at a quarter to 4:00 in the morning? He is not worried about what [her roommate] is thinking. He is [doing] exactly what he told you he was doing, getting some ass. And I am apologizing for using the crass words, but those were his words, not mine.

¶ 44    Robinson asserts that the prosecutor's statements insinuated that he was in an intimate relationship with and cheating on the woman he lived with, and that this insinuation was irrelevant and unfairly prejudicial.

¶ 45    The prosecutor never stated that Robinson was in an intimate relationship with the woman he lived with because Robinson's timely objection prevented her from doing so. As for the reasons for Robinson's apology, "[p]rosecutors may comment on the evidence admitted at trial and the reasonable inferences that can be drawn therefrom." *People v. McMinn*, 2013 COA 94, ¶ 61. The prosecutor's argument that Robinson's text message to A.M.'s roommate was an apology for sexually assaulting A.M., not merely for requesting sex from A.M., was a fair response to Robinson's characterization of the text message apology. *People v. Richardson,* 58 P.3d 1039, 1046-47 (Colo. App. 2002).

¶ 46    However, we agree that the nature of Robinson's relationship with the woman with whom he lived, and whether he might have been unfaithful to her, was irrelevant.  The woman had nothing whatsoever to do with the charges in this case.  The trial court apparently recognized this because it sustained an objection to such evidence during the testimony portion of the trial.  The prosecutor should not have insinuated that Robinson was being unfaithful to the woman, especially after the trial court sustained the objection.  On retrial, the trial court, upon proper objection, should limit testimony and argument to that logically related to Robinson's apology.

## IV.    Conclusion

¶ 47    The judgment of conviction is reversed, and the case is remanded for a new trial.

JUDGE HARRIS concurs.

JUDGE FURMAN specially concurs.

JUDGE FURMAN, specially concurring.

¶ 48     Racial prejudice has no place in our criminal justice system. Racial evidence or argument might have a place in proper context, though.  The question in this case is when can parties introduce evidence or argument related to race without inviting racial prejudice.  I agree with the majority that the judgment should be reversed and the case remanded with directions.  I write separately, however, because it is my hope that should the supreme court review this case, it will give guidance on when, if ever, it is proper for evidence or argument related to race to be presented to the jury.

¶ 49     Both sides seem to agree that some circumstances, such as identification, evidence of race might be relevant and serve a legitimate purpose.  The prosecution contends that such a purpose was present in this case, while Robinson contends that "there was no need or legitimate reason for the prosecution to highlight Mr. Robinson's race."  I agree with Robinson.

I.     Racial Evidence or Argument Can Be Prejudicial

¶ 50     Among the most vital precepts of American law are equal protection and due process.  Evidence or argument that improperly injects race into a trial risks denying a defendant both.  As Justice

22

Sotomayor recently noted, such evidence or argument is "an affront to the Constitution's guarantee of equal protection of the laws. And by threatening to cultivate bias in the jury, it equally offends the defendant's right to an impartial jury." *Calhoun v. United States*, 568 U.S. 1206, 1206 (2013) (Sotomayor, J., respecting denial of certiorari).

¶ 51 The eradication of racial considerations from criminal proceedings is one of the animating purposes of the Equal Protection Clause of the Fourteenth Amendment. *Miller v. North Carolina*, 583 F.2d 701, 707 (4th Cir. 1978). Our law demands that people be punished for what they do, not who they are. *Buck v. Davis*, 580 U.S. ___, ___, 137 S. Ct. 759, 778 (2017); *Rose v. Mitchell*, 443 U.S. 545, 555 (1979) ("Discrimination on the basis of race, odious in all aspects, is especially pernicious in the administration of justice.").

¶ 52 Regarding due process, the jury is a criminal defendant's fundamental "protection of life and liberty against race or color prejudice." *McCleskey v. Kemp*, 481 U.S. 279, 310 (1987) (quoting *Strauder v. West Virginia*, 100 U.S. 303, 309 (1880)). The right to a trial by a fair and impartial jury guaranteed by both the United

23

States Constitution and article II, sections 16 and 23, of the Colorado Constitution implies a verdict free from the admission of evidence or argument that arouses the prejudices of the jury. *Harris v. People*, 888 P.2d 259, 263-64 (Colo. 1995).

¶ 53    Evidence or argument related to race might provoke prejudices in the jury.  Thus, a jury that has been misled by inadmissible argument or evidence cannot be considered impartial.  *Id.* at 264. Regardless of whether the prosecutor's appeal to prejudice was subtle or unintended, we cannot ignore "that references to race not intended to provoke prejudice may nevertheless do so."  Sheri Lynn Johnson, *Racial Imagery in Criminal Cases*, 67 Tul. L. Rev. 1739, 1778 (1993).

¶ 54    But knowing the magnitude of the impact that evidence or argument related to race could have on the jury is impossible.  As the United States Supreme Court recently explained, "the impact of [race-related] evidence cannot be measured simply by how much air time it received at trial or how many pages it occupies in the record. Some toxins can be deadly in small doses."  *Buck*, 580 U.S. at ___, 137 S. Ct. at 777.

¶ 55 In this case, the prosecutor's remarks were particularly troubling because they echoed our country's history of prejudice toward black men, particularly those accused of victimizing white women. *See Loving v. Virginia*, 388 U.S. 1, 7 (1967) (noting the State's reliance on white supremacist doctrines to justify statutes preventing interracial marriage); *see also Miller*, 583 F.2d at 708 (where the prosecutor argued that a white woman would never consent to sexual relations with a black man).

¶ 56 The seemingly illogical verdict in this case is also troubling. E.G.'s testimony represented a large portion of the evidence against Robinson. Given that A.M. was unconscious at the time, E.G. was the only eyewitness to Robinson's acts against her and A.M. Yet, the jury, by acquitting on the sexual assault charges and the charges regarding E.G., apparently did not believe much of E.G.'s testimony. It nonetheless found Robinson guilty of attempted sexual assault (two counts) and unlawful sexual contact (two counts) against A.M. This outcome begs the question — was this a compromise verdict? And if so, was it poisoned by racial prejudice?

## II. Racial Evidence or Argument Can Be Relevant

¶ 57    Even so, I understand the State's position — evidence or argument related to race is sometimes relevant, even necessary, evidence. The State, quoting *United States v. Doe*, 903 F.2d 16, 25 (D.C. Cir. 1990), contends that "the impropriety of racially biased comments only extends to 'comments beyond the pale of legally acceptable modes of proof,'" and that "[a]n unembellished reference to evidence of race . . . poses no threat to purity of the trial."

¶ 58    Giving the prosecutor the benefit of the doubt, Robinson's skin color, or rather the *contrast* between his and A.M.'s skin colors, might have been relevant to bolster E.G.'s testimony. Perhaps this explains why Robinson did not object and the district court judge did not interrupt during opening statement. But, when E.G. described how she was able to see that Robinson was penetrating A.M., she made no mention of Robinson's race, skin color, or any contrast between them.

¶ 59    Then, for no proper purpose that I can identify, the prosecutor directly asked E.G. about Robinson's race and complexion. At that point, any potential relevance of Robinson's race had dissipated. This was not an identity case. A.M. knew Robinson, and Robinson

admitted being there.  And, E.G. did not point to Robinson's race as aiding her ability to view the act of penetration in any way.

¶ 60     Instead, the prosecutor's questioning simply drew attention to a characteristic that the Constitution generally commands the jury to ignore.  *McFarland v. Smith*, 611 F.2d 414, 417 (2d Cir. 1979); *see also McCleskey*, 481 U.S. at 309 n.30 (noting the numerous cases in which the United States Supreme Court has sought to eradicate racial prejudice from our criminal justice system).  Thus, as the majority concluded, the prosecutor's injection of race into the trial was improper in this case.

¶ 61     Still, I recognize that there are cases where racial evidence or argument is relevant.  As noted by both parties, race may be relevant where the prosecution has to prove the identity of the perpetrator.  Race would likely also be relevant to prove motive for a particular type of hate crime.  Yet, in what cases and to what extent evidence or argument related to race is admissible as a general rule remains unclear.

III.    Supreme Court Should Give Guidance

¶ 62     My primary concern is a fair trial for both sides.  Fairness to a defendant means that his or her rights are protected.  Most notably

here, the rights to due process and equal protection of the law are essential. Due process necessarily includes a fair and impartial jury. Fairness to the prosecution and the people of the State of Colorado, on the other hand, requires that we not unduly burden the State by unnecessarily excluding relevant evidence.

¶ 63 Our rules of evidence and procedure are designed to keep the trial fair. They prevent poisoning the jury with prejudicial, irrelevant, or unreliable information. The rules also give both sides adequate notice to prepare their cases effectively.

¶ 64 Still, evidence or argument related to race is different. In a recent case, Justice Kennedy noted that "[a]ll forms of improper bias pose challenges to the trial process. But there is a sound basis to treat racial bias with added precaution." *Pena-Rodriguez v. Colorado*, 580 U.S. ___, ___, 137 S. Ct. 855, 869 (2017). I agree that added precaution is necessary to prevent racial prejudice from entering a trial.

¶ 65 Thus, the question is when can parties introduce racial evidence or argument without inviting racial prejudice. I agree with the Court of Appeal of Louisiana, Second Circuit, which stated that racial evidence or argument is improper and calls for a mistrial if it

28

is "not material and relevant and might create prejudice against the defendant in the mind of the jury." *State v. Walker*, 221 So. 3d 951, 966 (La. Ct. App. 2017); *see also* La. Code Crim. Proc. Ann. art. 770 (2017). Based on my review of the record, because the prosecutor's questions regarding Robinson's race had no relevance to a disputed issue at trial and might create undue prejudice against him in the mind of the jury, I agree with the majority that the case should be reversed and remanded for a new trial.

¶ 66 But, to provide the added precaution to which Justice Kennedy alluded, I believe that addressing evidence or argument related to race pretrial would be more appropriate. Parties should give notice of their intent to introduce evidence or argument related to race and should have to overcome a presumption that such evidence is irrelevant. A pretrial screening process would provide parties with clear guidelines of what is relevant and appropriate and help ensure that evidence or argument related to race is only used for a proper and limited purpose. Plus, parties' objections would be preserved, and the trial court's findings would be clearly recorded for appellate review.

¶ 67     True, a witness might unexpectedly introduce racial evidence or comments during direct or cross-examination. Should this happen, I suggest the parties be afforded an opportunity outside the jury's presence to have the trial court determine what, if any, additional racial evidence might have a proper and limited purpose.

¶ 68     Our supreme court has drawn clear lines for other kinds of prejudicial evidence or argument. *See, e.g.*, CRE 404(b); *People v. Spoto*, 795 P.2d 1314, 1319 (Colo. 1990) (stating that prior bad acts are presumptively inadmissible unless prosecutor articulates logical relevance independent of the forbidden propensity inference); *see also Wilson v. People*, 743 P.2d 415, 420 (Colo. 1987) (a prosecutor calling the defendant and defense witnesses liars is plain error). It is my hope that, should the supreme court review this case, it will draw an equally clear line for racial evidence or argument in criminal cases.