# IN THE COURT OF APPEALS OF THE STATE OF IDAHO

## Docket No. 41236

| | | |
|---|---|---|
| **STATE OF IDAHO,** | ) | **2014 Opinion No. 107** |
| | ) | |
| **Plaintiff-Respondent,** | ) | **Filed: December 19, 2014** |
| | ) | |
| v. | ) | **Stephen W. Kenyon, Clerk** |
| | ) | |
| **JAMES D. KIRK, aka SNOOP, JAMEY KIRK,** | ) | |
| | ) | |
| | ) | |
| **Defendant-Appellant.** | ) | |
| | ) | |

Appeal from the District Court of the Third Judicial District, State of Idaho, Canyon County. Hon. James C. Morfitt; Hon. Juneal C. Kerrick, District Judges.

Judgment of conviction, <u>vacated</u> and <u>case remanded</u>.

Sara B. Thomas, State Appellate Public Defender; Spencer J. Hahn, Deputy Appellate Public Defender, Boise, for appellant. Eric D. Fredericksen argued.

Hon. Lawrence G. Wasden, Attorney General; Daphne J. Huang, Deputy Attorney General, Boise, for respondent. Kenneth K. Jorgensen argued.

---

LANSING, Judge

James D. Kirk appeals from his convictions for lewd conduct with a minor child under sixteen and sexual battery of a minor sixteen or seventeen years old. Kirk contends that the prosecutor improperly injected race into his case by singing the first few lines of the song "Dixie" during closing argument. Kirk submits that the act unconstitutionally tainted his trial because the alleged victims were white and he is African-American.

## I.

## BACKGROUND

On August 12, 2012, at about 6 p.m., four juvenile females, seventeen-year-old J.C., thirteen-year-old M.F., fifteen-year-old A.M., and fifteen-year-old M.G., ran away from the group home where they all resided. Outside a motel in downtown Nampa the four encountered

1

defendant Kirk, who invited the girls into his room. They all spent the night there. A.M. and M.G. left the motel together early the next morning, and J.C. and M.F. departed together later that day.

When J.C. and M.F. were apprehended by Nampa police that evening, M.F. informed an officer that Kirk had raped her during the night in the motel room and that J.C. had participated in the rape by holding her down. M.F. further told the police that she was menstruating when the sexual assault occurred, so her blood would likely be found on the bed's comforter. J.C., although uncooperative at first, eventually told police that she and M.F. both had vaginal sex with Kirk while the three were in bed together, but J.C. denied holding M.F. down or forcing her to participate. Witnesses A.M. and M.G. turned themselves in to police a few days later and, when interviewed, said that they had observed Kirk, J.C., and M.F. having sex together and that M.F. was a willing participant. All of the girls said that Kirk offered them intoxicating prescription medication, which they ingested. A search warrant was obtained for the motel room, and police seized Kirk's cell phone and a blood-stained comforter. Kirk was arrested and admitted to a detective that the girls had been in his motel room, but he denied any sexual conduct.

Kirk was charged with one count of lewd conduct with a minor child under sixteen, Idaho Code § 18-1508, for sexual acts against thirteen-year-old M.F., and one count of sexual battery of a minor sixteen or seventeen years of age, I.C. § 18-1508A(1)(a), for sexual acts against seventeen-year-old J.C. The case was prosecuted primarily on the girls' testimony, which was in accord with what they had told the police, bolstered by the testimony of a sexual assault nurse who said that a physical examination of M.F. revealed vaginal tearing and abrasion consistent with sexual intercourse.

During closing argument, defense counsel focused on perceived weaknesses in the State's case, including the State's failure to gather physical evidence that might have corroborated or refuted the girls' testimony. Defense counsel pointed out that none of the girls were given a toxicology screen to confirm the presence of drugs in their systems and that no pills or pill bottles matching the medication that the girls described were found in the motel room. Defense counsel noted that although M.F. said that Kirk had taken cell phone photos of J.C. in her underwear, the police did not search Kirk's phone for photos. The defense also emphasized that the vaginal swabs taken from M.F. tested negative for male DNA and that J.C. was never asked

2

to undergo a sexual assault examination. Similarly, the defense closing argument reminded the jury that a DNA test on a stain from the blood-stained comforter determined that the blood did not match either M.F. or Kirk, and counsel asserted that the State's failure to test other blood stains on the comforter and the failure to test the bedding for semen were further indicia of a lax investigation. All of this, the defense argued, left reasonable doubt as to guilt.

In her rebuttal closing argument, the prosecutor responded:

> Ladies and gentlemen, when I was a kid we used to like to sing songs a lot. I always think of this one song. Some people know it. It's the Dixie song. Right? Oh, I wish I was in the land of cotton. Good times not forgotten. Look away. Look away. Look away. And isn't that really what you've kind of been asked to do? Look away from the two eyewitnesses. Look away from the two victims. Look away from the nurse in her medical opinion. Look away. Look away. Look away.[1]

Defense counsel did not object to this argument. The jury found Kirk guilty on both charges.

Kirk is a black man while the victims in this case were white females. Kirk's sole claim of error is that his constitutional rights to due process and equal protection were violated when the prosecutor sang or recited the lines from "Dixie," thereby injecting the risk of racial prejudice into the case.

## II.

## ANALYSIS

Under Idaho law, if a mistake that occurred during a criminal trial was not followed by a contemporaneous objection, the judgment of conviction will be reversed only if the appellant establishes that the mistake rose to the level of fundamental error. This requires that the defendant persuade the court that the alleged error: (1) violates one or more of the defendant's unwaived constitutional rights; (2) is clear or obvious without the need for reference to any additional information not contained in the appellate record; and (3) there is a reasonable possibility that the error affected the outcome of the trial proceedings. *State v. Perry*, 150 Idaho 209, 226, 245 P.3d 961, 978 (2010). *But see State v. Skunkcap*, 157 Idaho 221, 235, 335 P.3d 561, 575 (2014) where, without expressly modifying or overruling *Perry*, the Idaho Supreme Court said that an appellant claiming fundamental error must show a reasonable *likelihood* that

---

[1] The transcript does not disclose whether the words to "Dixie" were spoken or sung, but the defendant's notice of appeal asserts that they were sung.

the error affected the verdict. Whether a prosecutor's comments during closing argument rise to the level of fundamental error is a question that must be analyzed in the context of the trial as a whole. *State v. Severson*, 147 Idaho 694, 720, 215 P.3d 414, 440 (2009). The relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the resulting conviction a denial of due process. *State v. Carson*, 151 Idaho 713, 718-19, 264 P.3d 54, 59-60 (2011) (citing *Darden v. Wainwright*, 477 U.S. 168, 181 (1986), and *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

There is no question that a prosecutor's improper infusion of race into a criminal trial violates a defendant's constitutional rights. "The Constitution prohibits racially biased prosecutorial arguments." *McCleskey v. Kemp*, 481 U.S. 279, 309 n.30 (1987). In *State v. Romero-Garcia*, 139 Idaho 199, 75 P.3d 1209 (Ct. App. 2003), a case where the prosecutor emphasized the defendant's status as a noncitizen of the United States during closing argument, we said:

> [A] prosecutor is constitutionally prohibited from making racially or ethnically inflammatory remarks during its closing argument. *See McCleskey v. Kemp*, 481 U.S. 279, 309 n.30, 107 S. Ct. 1756, 1770 n.30, 95 L. Ed. 2d 262, 289 n.30 (1987); *Bains v. Cambra*, 204 F.3d 964, 974 (9th Cir. 2000). Such comments violate a criminal defendant's due process and equal protection rights. *Bains*, 204 F.3d at 974. Appeals to racial or ethnic prejudice can distort the search for truth and drastically affect a juror's impartiality. *United States v. Doe*, 903 F.2d 16, 24 (D.C. Cir. 1990).
>
> Upon review of the prosecutor's comments in the case at bar, this Court concludes that the prosecutor's emphasis on Romero-Garcia's status as a non-citizen of the United States could be viewed as a subtle appeal to the jury's racial or ethnic prejudice. Even an artfully constructed appeal to a jury's prejudices cannot avoid application of the prohibition against such comments.

*Romero-Garcia*, 139 Idaho at 203, 75 P.3d at 1213.

To support his argument that the song "Dixie" is racist in its origin and lyrics and is disparaging to black people, Kirk cites in his briefing a number of newspaper articles. The State objects to our consideration of these on the ground that the articles are "evidence" that this Court may not consider because the articles were not presented to the trial court. We need not resolve that dispute, for this Court does not require resort to articles or history books to recognize that "Dixie" was an anthem of the Confederacy, an ode to the Old South, which references with praise a time and place of the most pernicious racism. The prosecutor's mention of the title,

"Dixie," as well as the specific lyrics recited by the prosecutor, referring to "the land of cotton," expressly evoke that setting with all its racial overtones.

The State maintains, however, that there was no "clear or obvious" constitutional error here because the prosecutor acted with innocent intent, presenting "simply a personal story of singing in her youth" to make a legitimate point that Kirk's closing argument asked the jury to "look away" from the prosecution's evidence. This was not, the State argues, an overt appeal to racial prejudice. We agree that the racial reference here was indirect and perhaps innocently made. This prosecutor may not have intended to appeal to racial bias, but a prosecutor's mental state, however innocent, does not determine the message received by the jurors or their individual responses to it. An invocation of race by a prosecutor, even if subtle and oblique, may be violative of due process or equal protection. As the Second Circuit Court of Appeals stated in *McFarland v. Smith*, 611 F.2d 414, 416-17 (2nd Cir. 1979):

> Race is an impermissible basis for any adverse governmental action in the absence of compelling justification. . . . To raise the issue of race is to draw the jury's attention to a characteristic that the Constitution generally commands us to ignore. Even a reference that is not derogatory may carry impermissible connotations, or may trigger prejudiced responses in the listeners that the speaker might neither have predicted nor intended.

*See also State v. Monday*, 257 P.3d 551 (Wash. 2011) (finding constitutional infringement where the prosecutor several times pronounced "police" as "po-leese" while conducting examination of African-American witnesses). We conclude, therefore, that Kirk has demonstrated a clear violation of his unwaived constitutional right to due process and equal protection.

Whether Kirk has satisfied the third prong of the *Perry* fundamental error test, by showing a reasonable possibility (or likelihood) that the error affected the outcome of the trial, is a more difficult question. Kirk argues that when the constitutional error at issue is a prosecutor's improper introduction of race into a criminal trial, the defendant should be relieved of the burden of showing prejudice. He maintains we should treat this circumstance as structural error requiring automatic reversal or, alternatively, that the burden should be shifted to the State to demonstrate that the error is harmless.

The United States Supreme Court has described structural error as a constitutional deprivation that creates a structural defect affecting "the framework within which the trial proceeds, rather than simply an error in the trial process itself" and thus renders the trial so unfair

5

that it is not subject to harmless error analysis. *Arizona v. Fulminante*, 499 U.S. 279, 310 (1991). Structural errors are to be distinguished from "trial errors" which, though depriving the defendant of a constitutional right, occur "during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented" in order to determine whether the error was harmless beyond a reasonable doubt. *Id.* at 307-08. Errors that have been identified by the United States Supreme Court as structural error include the complete denial of counsel (*Gideon v. Wainwright*, 372 U.S. 335 (1963)); a biased trial judge (*Tumey v. Ohio*, 273 U.S. 510 (1927)); racial discrimination in the selection of a grand jury (*Vasquez v. Hillery*, 474 U.S. 254 (1986)); denial of the right of self-representation at trial (*McKaskle v. Wiggins*, 465 U.S. 168 (1984)); denial of a public trial (*Waller v. Georgia*, 467 U.S. 39 (1984)); a defective reasonable-doubt instruction (*Sullivan v. Louisiana*, 508 U.S. 275 (1993)); and deprivation of the right to counsel of choice (*United States v. Gonzalez-Lopez*, 548 U.S. 140 (2006)).

The Idaho Supreme Court's *Perry* decision leaves open the possibility that fundamental error review would not require a defendant to demonstrate prejudice in the event of structural error, *see Perry*, 150 Idaho at 225-26, 245 P.3d at 977-78, but to date neither the United States Supreme Court nor the Idaho Supreme Court has held that an appeal to racial prejudice during the presentation of evidence or argument to a jury constitutes structural error.[2] In our view, a prosecutor's improper reference to racial factors during the trial, though offensive and fraught with risk of prejudice to the defendant, does not amount to structural error, for it does not affect the entire framework or context within which the trial proceeds as do the circumstances that have heretofore been identified as structural error. Like other types of prosecutorial appeals to a jury's passion or prejudice, this conduct is trial error. In addition, we do not possess authority to modify Idaho Supreme Court precedent. Therefore, we are not at liberty to create an exception to the third prong of the *Perry* fundamental error test by shifting the burden to the State to establish that the error was harmless.

We thus arrive at the question whether Kirk has shown a reasonable possibility per *Perry*, 150 Idaho at 226, 245 P.3d at 978 (or likelihood, per *Skunkcap*, 157 Idaho at 235, 335 P.3d at 575), that the prosecutor's argument, raising the specter of racial prejudice, affected the outcome

---

[2] At least two courts have done so, *Miller v. North Carolina*, 583 F.2d 701, 708 (4th Cir. 1978), and *Weddington v. State*, 545 A.2d 607, 614-15 (Del. 1988).

of the trial. In answering this inquiry for other types of fundamental error, we have often considered principally the weight of the evidence supporting the defendant's conviction to determine whether the trial outcome would have been the same absent the constitutional error. *See State v. Parton*, 154 Idaho 558, 568-69, 300 P.3d 1046, 1056-57 (2013); *State v. Galvan*, 156 Idaho 379, 386-87, 326 P.3d 1029, 1036-37 (Ct. App. 2014); *State v. Betancourt*, 151 Idaho 635, 641, 262 P.3d 278, 284 (Ct. App. 2011). We are not convinced, however, that a singular focus on the strength of the State's evidence is always appropriate where the constitutional error is State conduct that focuses the jury on racial factors. Although not deeming this error to be structural, we note that provocation of racial animus against a criminal defendant carries some of the characteristics of structural error in that racial bias implicates the defendant's right to a trial before an impartial jury. Like racial discrimination in the selection of jurors or grand jurors, the injection of racial considerations in closing arguments "casts doubt on the integrity of the judicial process," and "impairs the confidence of the public in the administration of justice." *Rose v. Mitchell*, 443 U.S. 545, 556 (1979).

Because of these considerations, courts from other jurisdictions have sometimes modified or relaxed the standards for determining whether the error was prejudicial where the prosecution invoked racial considerations. An example is *Monday*, a murder and assault case against an African-American defendant. During direct examination of two African-American witnesses who were not "enthusiastic proponents of the state's case," the prosecutor repeatedly pronounced "police" as "po-leese." *Monday*, 257 P.3d at 553-54. To discount the credibility of the same witnesses during closing argument, the prosecutor also suggested that there existed an anti-snitch code among African-Americans. The defense did not object to either of these tactics. The Washington Supreme Court found the prosecutor's acts to be appeals to racial stereotypes or racial bias that violated the defendant's right to an impartial jury. *Id.* at 556-57. Stating that the gravity of the violation "cannot be minimized or easily rationalized as harmless," the court abandoned its historical requirement that a defendant show "a substantial likelihood that the misconduct affected the verdict"; instead, the court cast the burden onto the state to show, beyond a reasonable doubt, that the misconduct did not affect the verdict. *Id.* at 558 (majority), 564-65 (Johnson, J., dissenting); *see also In re Gentry*, 316 P.3d 1020, 1025 (Wash. 2014). Then, despite evidence against the defendant that included a videotape of the offense and the defendant's own confession, the court concluded that "we cannot say that the misconduct did not

7

affect the jury's verdict" and reversed the conviction. *Monday*, 257 P.3d at 553, 558. Similarly, in *State v. Cabrera*, 700 N.W.2d 469 (Minn. 2005), after finding that the prosecutor committed misconduct by wrongfully accusing defense counsel of asserting a racist defense, the Minnesota Supreme Court reversed the conviction despite acknowledging that given the strength of the state's evidence, including two eyewitnesses' identification and the defendant's admissions, "it would be difficult for us not to conclude that the prosecutor's comments were harmless beyond a reasonable doubt." *Id.* at 475. The court said that "[a]ffirming this conviction would undermine our strong commitment to routing out bias, no matter how subtle, indirect, or veiled," and that the court would therefore reverse the conviction and remand for a new trial "in the interest of justice and in the exercise of our supervisory powers." *Id.*

In the present case, nothing in the record suggests that the jurors harbored any racial prejudice or that they were actually influenced by the prosecutor's recitation of "Dixie," but the risk of prejudice to a defendant is magnified where the case is as sensitive as this one, involving alleged sexual molestation of minors. As the Fourth Circuit observed in *Miller v. North Carolina*, 583 F.2d 701, 707 (4th Cir. 1978), "[c]oncern about fairness should be especially acute where a prosecutor's argument appeals to race prejudice in the context of a sexual crime, for few forms of prejudice are so virulent." In this circumstance, both the constitutional obligation to provide criminal defendants a fundamentally fair trial and the interest of maintaining public confidence in the integrity of judicial proceedings weigh against imposing a stringent standard for a defendant's demonstration that the error was harmful. Although the State's case here was a strong one, it was not so compelling that no rational juror could have voted to acquit, particularly with respect to the charge involving J.C., for which there was no physical evidence corroborating the charge. While there may be other cases where a prosecutorial remark with racial overtones would be harmless error, given the nature of this particular case, and considering the totality of the evidence and trial proceedings, we conclude that Kirk has demonstrated a reasonable possibility (or likelihood) that the error affected the outcome of the trial. Kirk is therefore entitled to a new trial.

The judgment of conviction is vacated and the case remanded for further proceedings.

Judge GRATTON and Judge MELANSON **CONCUR.**